LEON HOCHSTEIN. **8240** NO. 8,240

versus : COURT OF APPEAL

AMERICAN AUTOMOBILE INSURANCE CO. : PARISH OF ORLEANS

---

WILLIAM A. BELL, JUDGE:

---

JUDGMENT REVERSED.

June 19th, 1922.

June 19-22

431

BY: WILLIAM A. BELL, JUDGE:

Plaintiff herein has recovered judgment in the sum of $358.90 against defendant, American Automobile Insurance Company, under a fire clause in a certain policy issued by the Company in plaintiff's favor, under date of May 13, 1920.

The petition alleges that on May 17, 1920, three days after the date of said policy, plaintiff's automobile was damaged by fire, with the result that the blocks, pistons and rings, bushings and bearings were burned and completely ruined, the replacement of which cost the amount sued upon; that from no fault of p. titioner but purely from accidental causes, the damage was sustained; that notwithstanding amicable demand, defendant has refused to meet or recognize its liability under the policy, and therefore there should be judgment for not only the amount of damages, but for twelve per cent additional damages upon the amount sued for, and also for reasonable attorney's fees.

Defendant admits the issuance of the policy and its existence at the date of the alleged fire, but denies that the damages if any, were due to any fire loss or other cause for which it could be liable under the terms of the policy, and particularly denies that it is liable for damages or attorney's fees under Act 168 of 1908.

There was judgment rendered in the trial court only for the amount of actual damages to the automobile. Plaintiff has answered the appeal to this court, and prays for all damages claimed in the petition.

We find from the evidence that plaintiff's wife was driving the car on the morning of May 17, 1920, and that for some reason not shown by her testimony, or that of other witnesses, the machine was not working satisfactorily. For this reason she returned with the car to plaintiff's garage, and not being able to again start the engine, she called to the colored mechanic then in or around the garage.

432

She testifies that as soon as this man started to crank the car, there was a dreadful combustion, sounding like the car was going to pieces, and that when she saw flames coming from the "breather" she shouted to the mechanic, who told her to "shut the motor off quick," which she did, and that thereafter they were unable to re-start the car or to get the engine to turn over at all. Both of these witnesses testify that at the moment of the accident the hood of the car was raised. This fact convinces us that the fire, or what the mechanic terms as "a little flame coming out of the breather," was not confined or shut in against the mechanism of the car.

Plaintiff's wife and the mechanic were the sole witnesses to the accident, and both agree that the combustion, if any, was but momentary, and explosive in its nature. Their evidence is corroborative that there was no visual evidence of a fire from the outward appearance of the engine, radiator, or other parts, but that after the accident, when the crank case and blocks were removed or opened, the piston rods, rings, bushings and bearings, were found to be burned. They each agree when asked to describe the extent or nature of damage to these parts, that they were all burned because they were covered with a black or brown soot, but that none of these parts were in any way melted. Mrs. Hochstein says: "They had a sort of warped swelling," but the mechanic denies that they were warped, but only sticky, and full of soot. This man further testifies that he had been attending to the car for about three years, and that about two months before the fire he had overhauled the car and put it in good condition, especially in respect to the several parts which he testified were damaged by the fire. He undertakes to say that as a result from the fire, these parts were worn below the normal standard (or size) of what they should have been, and did not fit anywhere, having about an eighth of an inch play in them after being burned. However, just before giving this

433

kind of testimony, and after swearing that none of the parts were warped, he undertakes the additional statement that the pistons were so tight in the blocks that he had to use all of his force to remove them . When cross-examined about the worn condition of these parts, he admitted that they could have been so by wear and tear, though he insisted that they were burned.

Mr. J.D. Pique was another witness for the plaintiff, the chief mechanic for the Cadillac Agency in this City, the injured car being a Cadillac. This witness testified that at the request of plaintiff's wife he examined the car after the explosion, but only saw the blocks and pistons, which seemed scarred and burned beyond usage, which to him was evidence of burning, though he did not see the "blaze" himself, but had only heard of one through Mrs. Hochstein. On cross-examination, he testified in part, as follows:

"Q. Mr. Pique, in what sense do you use
 the word "burned"?

A. Burned--it is pretty hard to say what
 sense you use it in, because it could
 be burned from fire, but other ob-
 jections were made here and it is use-
 less to ask me that.

Q. Well, just tell me in what sense the
 word burned can be understood.

A. A car, to be burned beyond usage, as
 that car had been burned, had to happen
 at the minute; in a few ---probably about
 twenty strokes. There could have been a
 flare in the cranked car and burned, from
 the conditions,--because it could not have
 been run very long in that condition; a
 block scarred will not heat, and those
 blocks were scarred.

Q. The word burned is used in a dual sense;
 one burned from fire, and one burned from
 friction?

A. Yes, sir, it is.

Q. This evidence of burning, which you saw,
 was evidence of burning in what sense,
 from fire or from friction?

434

A. Well now, if the case was put to me, as it was, to take a look at the blocks and say how they were burned, it would be impossible. There is no mechanic or engineer in this city or in the United States who could ever tell you, unless they saw the flames, or what it originated from.

Q. Now, what happens when you apply heat of high intensity to metal such as is used in the construction of those portions of an automobile?

A. A fire could not melt anything except -- on an inside of a motor like that, couldn't melt anything, with the exception of the babbit inside of the bearing on the crankshaft.

Q. Why?

A. It is not that intense.

Q. What is the first change which would occur as the result of the application of heat to metal such as cast iron or steel, what change would it undergo?

A. It would show signs of burning, the same as practically any fire of that kind would.

Q. It would not consume the metal, as wood would be consumed?

A. No, sir, because it is not intense enough.

Q. If it was sufficiently intense what would occur, would the metal actually be consumed, such as a piece of wood would be, or would the shape of the metal be altered because of the fact that the metal had begun to run? Would the metal be consumed, or would it run, granting there was sufficient heat?

A. If it was intense enough anything will run, no matter how great it is? If you get enough heat in it, but you can't get it inside of the motor.

Q. In this particular instance there was not a heat of sufficient intensity to cause the running of the metal?

A. No.

Q. Now, as I understand your testimony, there was nothing in the appearance of these alleged damaged parts which would enable any engineer on earth to state from that whether or not that damage resulted from fire or from friction; is that it?

A. That is correct."

435

This witness being recalled by plaintiff,

on rebuttal, again testified under cross-examination, as follows:

"Q. As I understood the general purport of your testimony at the last hearing you were unable to state with absolute certainty whether or not this damage was caused by an actual flame or fire?

A. Absolutely. Nobody living can tell you, either?

The testimony of this witness on behalf of plaintiff has been carefully reviewed by us for the reason that he appears to be a mechanic with expert knowledge concerning the construction and mechanism of automobiles, especially the kind of automobile involved in this suit, and we are impressed particularly with that part of his testimony in which he honestly declares that neither himself nor any other mechanic could advise the Court, unless having seen the explosion, or flames, what the accident originated from. He not having seen the accident, has not undertaken to say what was its cause, but in this case there are other expert witnesses whose testimony has been offered by defendant, who have testified under oath that in their opinion the condition of the parts claimed to have been injured distinctly shows that said condition could not have been caused by a fire, but that the parts show scarring, due to inperfect lubrication, and are in no manner "scaled" as they would have to be had they been subjected to a fire of any duration or intensity. The rebuttal of the testimony of the witness Marquis, called by plaintiff, is in our opinion largely hypothetical, and has not in any way assisted us, for the reason that he does not appear to have examined any of the damaged parts of the machine.

We pass now to the further consideration of the testimony given by witnesses for the defense.

It is true that none of these witnesses examined the parts until a month or two after the alleged fire, but two of them are experts, thoroughly qualified to pass upon the

cause of the alleged damage, as evidenced by the results seen at the time of their examination.

Mr. Grevenberg, the local representative of the defendant Company, but not an expert, states that he called into consultation with him Mr. Schayer and Mr. Jurgens, the other witnesses for the defense, who are experts. From this point in the record, the testimony for defendant is confined to what the experts found upon the examination authorized by Mr. Grevenberg.

We find that the testimony of these experts is consistent on the point that if there were any flame which followed the cranking of the machine by the colored mechanic, that it could not have been of any duration or intensity sufficient to warp or melt, or materially injure the parts to the extent alleged in this suit, and that had such intense conflagration occurred, the aluminum motor base of the engine would have melted long before the pistons or cylinder block, and before these could have even become red hot, and that such intensity of heat would have resulted in complete destruction of the motor base made of aluminum, or softer metals constituting the piston rods or other parts in the cylinder blocks.

Each of these witnesses corroborates the other's testimony to the effect that there was no evidence of damage to these parts beyond scarring, and that it was evident that the scarring was caused by improper lubrication, and that if there were any warping on the pistons, causing loss of motion, that such warping was due to age of the parts. In accounting, on a hypothetical basis for any explosion as claimed by plaintiff, and the colored mechanic, the witness Schayer swears that in his opinion there might have been a back fire, but that this back fire would have been spontaneous, and of the shortest duration, causing no damage, or at least, no such damage as plaintiff's evidence would indicate.

This same witness says that in all of his experience, over fifteen or twenty years, that he has never seen or heard of a fire in the "breather pipe" such as was claimed here,

437

unless it were attended with complete consumption of the motor itself, and that then, under such conditions, the motor would be all scaled up. He denies particularly that the blocks said to have been burned were warped, and says further that there was nothing the matter with the blocks, which could have been used, because the damage was not caused by any fire on them, though he admits that the machine needed repairing. Schayer further states that Lockett, the colored mechanic, showed him the parts stripped from the engine, and that he, Schayer, put his hand inside of the motor and around the pistons, and examined all the bearings, and that he called Lockett's attention at the time, and showed him that there was oil in all the parts, and that there was no scaling.

He further swears that scaling must follow very intense heat, and that it is easily observable, even two months after being subjected to such heat. He further states that he took the piston itself, and put it in the cylinder block, and that there was nothing the matter with the piston outside of its being a little worn. Witness concluded his testimony with the statement that he asked Lockett to save the old parts, and that if these parts had been brought into Court he could have "backed up" what he said about them.

At this point, it is to be noted that the witness, Lockett, when asked about the parts on first hearing of the case in the trial court, said that they were in the garage, and that he would be glad to bring them to Court if it was all right with Mrs. Hockstein. These parts were never offered in evidence by the plaintiff, and when Lockett was again requested to account for them on the second hearing of the case, he simply stated that he had not brought them to Court, but that they were in the garage for inspection.

Mr. W. M. Jurgens, an inspector for the Insurance Company, and also in the automobile repair business for over twenty years, was the other expert witness offered by defendant, who corroborated in almost every detail what was stated by Mr. Schayer, stating that he found no traces of fire whatsoever. It is true that he also examined the parts some time after the alleged conflagration, and that when he first saw the car the mechanic was overhauling it, and that he, witness, began to examine the hose and wire connections, which, as he said, is the first thing that shows evidence of a flame, and that these parts seemed to be in first class condition, outside of wear and tear; that the engine showed lack of lubrication. He further states that the babbit in the motor is the softest material used, and that to melt same would require 700 degrees of heat; that the babbit was not melted, and that by the time fire would reach the babbit bearings, it would destroy the aluminum cranking case on the outside, he having found the aluminum cranking case in this matter in first class condition. He was asked the question that if a temperature of 700 and some odd degrees were obtained, would it not burn the whole car, to which he replied that the whole car, the hood, the whole front, and the radiator, would have been totally destroyed by the time the aluminum cranking case showed any developments of fire.

He further states that lack of lubrication would have caused the condition of the pistons and bearings, as he found them, that is "scarred," and that the cylinders were all scarred, and the bearings all damaged, but not by fire.

He further says that the minute he looked at the cast iron, or cylinder walls, he was convinced that the car had been operated for many an hour with lack of lubrication, and that even if the automobile had been run for several hours before coming to the garage, that no heat could develop in the cranking

case, such heat having to develop from the outside by fire.

He further states that one of the babbited connecting rods was damaged, but only from lack of lubrication. He gives as positive, expert testimony, that if an automobile is being cranked up, and a fire is on the inside of it, and it continues for a minute or two, no damage can be done because the flame goes out, and there can be no damage to any part of the motor, the flame being confined between the carbureter and the hood.

This case is one involving questions of fact, conclusions from which by the court a qua, should be given great consideration by the Appellate Court. But we have been much impressed with the fact that the preponderance of evidence against the probability of a fire, for which defendant should be held liable, is largely in favor of the Insurance Company in this case.

We think that the weight of expert testimony is clearly in favor of defendant, and it is a reasonable presumption of law that the failure of the plaintiff to produce the alleged damaged parts at the trial in the lower court, especially when called for, that the presumption must be that this evidence would have been unfavorable to the plaintiff. For these reasons, we are of the opinion that there should be judgment in favor of defendant

It is therefore ordered, adjudged and decreed, that the judgment herein appealed from be, and the same hereby is reversed, and it is now ordered that there be judgment for defendant, the American Automobile Insurance Co., dismissing the petition of Leon Hochstein, plaintiff herein, at his cost in both courts.

JUDGMENT REVERSED AT PLAINTIFF'S COST

IN BOTH COURTS.

Judge *[signature]* dissents
for reasons on file

June 19th, 1922.

NO. 8240

COURT OF APPEAL

PARISH OF ORLEANS

————

LEONARD HOCHSTEIN

versus

AMERICAN AUTOMOBILE INSURANCE COMPANY.

————————

————————

Dissenting opinion of Dinkelspiel; J.

————

June 19- 22

H J Standbern

441

Dinkelspiel; J.

Plaintiff institutes this suit against the defendant, alleging that the defendant company is indebted to him in the sum of $358.90, with legal interest from judicial demand until paid, and twelve per cent on said amount of principal and interest for damages, and the further sum of $100.00, as Attorney's fees. Averring further that on the 13th of May, 1920, defendant company issued its fire and liability policy, annexed to this petition and made part thereof, in favor of plaintiff, for the sum of Eleven Hundred Dollars, to cover any loss by fire, on the Cadillac Touring Car belonging to plaintiff; that said policy was to be in force for a period of twelve months, commencing May 13th, 1920 and ending May 13th, 1921. That under the conditions of said policy, defendant company bound itself as the insurer to indemnify plaintiff for any loss to be incurred in accordance with the terms of its policy; and continuing, plaintiff represents that on May 17th, 1920, at about noon, a fire occurred, in which said automobile was damaged, and describing the damages states that the blocks, pistons and rings, bushings bearings were burned completely. Plaintiff had the damage repaired, paid the bills in order to put the automobile back in proper shape and has complied with all the terms and conditions of the policy, and notified defendant company, through its agents, of the loss and furnished proper proofs of loss, to the defendant. That subsequently defendant company, replying to plaintiff's proofs of loss, denied all liability under said policy. Plaintiff further avers that under the Act of the Legislature No. 168 of 1908, a fire insurance company which fails to pay its losses on a policy of insurance shall be liable in addition to the amount of loss, for twelve per cent damages on the total amount of loss determined by a Court of competent jurisdiction, and a reasonable

442

Attorney's fees, and in this suit $100.00 is claimed as
Attorney's fees.

The prayer of the petition is for /~~judgment~~ af- citation and for judgment in
ter due proceedings /~~xxxxxxxxxxxxxx~~ the sum claimed.

The defendant answers admitting the insurance
of said car by the policy sued upon, but denies that
there was any fire as alleged, or that there was any
damage done by fire; denies that the Act of the Legis-
lature referred to has reference or relates to an in-
surance company of the character of the defendant com-
pany; hence denies that it is indebted unto defendant
in any sum whatever.

Finally prays that plaintiff's petition be
dismissed at his cost.

Mrs. Leonard Hochstein, wife of plaintiff,
in her testimony in chief stated:

Q. Were you in charge of the automobile belonging to
Mr. Hochstein on May 17th, 1920 about twelve o'clock
noon?

A. Yes sir.

Q. Who was running the automobile?

A. I was.

Q. Did you try to start it?

A. Yes sir.

Q. Were you able to start it?

A. Not at that time.

Q. What did you do?

A. I called for the mechanic who was usually around
there and he came to my assistance and when he attempted
to start it by cranking it there was an awful combustion,
sounded like the car was going to pieces, and we saw
flames coming from the breather, which is the only part
from which flames could come if the fire was in the crankhead.

Q. Did you see the fire coming out of the automobile?

A. Yes sir.

Q. Was there anybody else around there.

A. The mechanic was Warren Lockett.

Q. What did you do about the fire?

A. When I saw the flame I called to him and he looked up and said "shut the motor off quick, which I did". We tried to restart it and it would not move at all, would not turn over at all.

Q. Did you examine the car then?

A. I had the crank-case taken off and the bearings were burned?

Q. Did you see the car after it was taken to pieces?

A. Yes sir.

Q. What did you see then as to damages?

A. All the pistons, rings and blocks, everything was burned.

She further testifies that the Company was notified and that a Mr. Singreen told witness to have the car repaired and everything would be all right; further testified that the amounts paid for the repair of the car were the amounts claimed for same in this suit.

On cross examination this witness does not in any wise waver in her testimony given in chief.

The next witness is Warren Lockett.

Q. On May17th, 1930, were you in the garage of Mr. Hochstein?

A. Yes sir.

Q. Were you called by Mrs. Hochstein?

A. Yes sir, she told me to look and see what was the matter with her machine?

Q. What did you do?

A. I went to see what was the matter with it, before that machine had stopped so we tried to crank it by the self starter and it would not go so I cranked it and in cranking it there was an awful noise in the motor; I looked to see what the trouble was and I saw a little flame coming from the breather.

Q. Saw a fire coming out of the machine?

A. Yes sir, so I told her to close the motor off.

Q. What did you do after she closed the motor off?

444

A. I knowed there was something wrong then and when I had
taken the crank case off I pulled out one of the pistons
on the connecting rod and there was a dry skin of soot;
you could wipe it off with your hand.

Q. Was the/hood ̶m̶a̶k̶a̶x̶ off at the time.

Q. We h d token it off.

Witness goes on to testify what was done by him
to the machine subsequent to what he had testified.

Witness testifies that he had been repairing au-
tomobiles for five or six years; that he repaired this au-
tomobile after the fire, that he had put in bushings,
bearings, blocks, pistons and rings, and the old parts
which they took off could not be used, they were no
good; also the automobile could not run.

This witness was asked by the Court:

Q. There is not doubt in your mind you saw flames coming
out from that place?

A. No sir, no doubt.

Counsel then asked the question:

Q. Could you swear positively that the damage you saw
resulted from these flames?

A. From the flame, yes sir.

He testifies that he had taken care of the
cars of plaintiff for ̶t̶h̶x̶ three years; he is a colored
man;and the further cross examination of this witness
was not in any wise materially different from his direct
examination.

Mr. Pique, an employee of the Revol Agency,
testified that he examined the automobile of the plain-
tiff shortly after May 17th, 1920; that after looking
at it, saw the blocks were scratched and burned, he
did not see the flame, but examined the parts of the
automobile and they all showed signs of what you term
a burn.

Q. They showed signs that they had met with fire?

A. Well, sure Mr. Hochstein said "I did'nt see the

445

flame", she said "they had a flame"; I saw the blocks
and they looked burned to me, also the pistons.

Q. And there was evidence of burning to your mind?

A. Yes sir.

Q. Was There was a charge made of $358.00 for this
work; do you consider that a reasonable charge?

A. Yes sir, I do.

On cross examination:

Q. Mr. Piquet, in what sense do you use the word burned?

A. Burned-It is pretty hard to say what sense you use it
in because it could be burned from fire, but/objections were
made so often here and it is useless to ask me that.

Q. Well just tell me in what sense the word burned can
be understood?

A. A car to be burned beyond usage is that the car had
been burned had to happen at the minute in a few-probably
in about twenty stroks there could be a flare in the crank
and it could not be run very hard in that condition, a
block scarred will not heat and those blocks were scarred.
The questions propounded to this witness on cross examina-
tion, which witness says were more scientific than practi-
cal, and witness from experience stated that he was more
practical as a mechanic than scientific. Further through-
cut his entire testimony, we are satisfied from his evi-
dence, taking it as a whole, that he was satisfied that
this car had been burned as he had first described it.

As an example of witnesses knowledge on the
question referred to, amongst other things asked was:

Q. If, in a case of this kind you were told that there
was a fire, and you saw the blocks in the condition in
which you did and you believed the witnesses to be credi-
ble what would be your opinion?

After some objections to the question, overruled by the
Judge, his answer is made:

A. Upon coming from people of the class of these people,
reliable people, my opinion would be that the blocks were

446

burned by fire, that would be my decision if the matter
was left for me to decide.

T. P. Marquis, a machinist, after stating that
he had been in business for thirty years testified:
Q. Have you had experience in regard to heating of metals
or the degree of heat that metals can withstand?
A. I have had considerable experience. Yes sir.

And being asked, "Is it possible to heat a metal
enough to dry the oil and stop all flow of it and allow the metal to cool
off without any oil or water and have the metal not to scar?
The witness answers: "It is possible."

On cross examination:

Hypothetical questions were propounded to this wit-
ness, and in our opinion have no bearing upon his prior testi-
mony.

Mr. Piquet was recalled:
Q. It was testified by Mr. Schayer that the flame that was
seen in this case was simply a backfire;from your experience
in repairing automobiles and from your examination of this
damage, will you testify whether thixaxmax there was any
evidence of a backfire?
A. No, there was no evidence of a backfire for the simple
reason that a backfire would only burn the outside surface,
the paint from the carbureter, therefore it would take and
scratch or burn the the paint off, and unless the fire con-
tinued say for a half hour it would be unable to reach the
base of the motor.

Amongst other questions, the witness was asked:
Q. You did state that if a statement were made by credible
witnesses that xxx they saw a fire and upon your examination
of the class they were, your opinion would be that the dam-
age was caused by fire?
A. Absolutely, because thx I believe that there is honor
among human beings, and I always work to that end.

The testimony of Mrs. Leonard Hochstein, recalled
as a witness, in no matter effects or changes her testimony

447

in chief.

And so do I find the testimony of Lockett, recalled, who reaffirmed in main the testimony given on his original examination.

The first witness on behalf of the defendant was Mr. Grevenberg, one of the local representatives of the defendant insurance company. He knew nothing of the fire itself, except he received a report there was a fire, was in the office at the time the report came in; the fire occurred on May 17th and he examined the car on June 10th following. So that his knowledge of the facts of the case and his testimony does not prove anything regarding

the case.

The next witness was a Mr. Schryer, who after a 'bow many years he had been in the business, fifteen or twenty years, and that he does all kinds of general repairs, also manufacturing, and at the request of Mr. Grevenberg made an examination of the automobile in question; he saw it either in the month of June or July following the fire.

Q. Was the automobile damaged by fire?

A. No evidence of fire.

Q. Was there any evidence of the metal having run?

A. No sir, the only evidence
that was there would show there was a dust caused from no lubrication on the connecting rod bearings.

Q. Was there any portion of this automobile whatever which showed there had been a fire?

A. I have seen no evidence of any fire whatever. Now there might be an explosion-like a back fire, causing an explosion, but it would be right out and be no damage.

Q. You mean the fire in the breather, to which Mrs. Rothstein has testified, might have been there, but the big fire—

A. I wouldn't say that—nothing is impossible, but I have never known it to be.

Q. In your experience, you have never seen that condition exist, fire in the breather pipe?

448

A. Only when the motor is burned up.

On cross examination the Court asked this question:

Q. How do you explain that a fire was seen coming out of the machine?

A. If there was an explosion it would flash up, and if you shut the motor down the fire would be down, it couldn't burn. And there was oil in the engine, even in the crank case, and all the parts were lubricated, excepting the connecting rods, which were put in new— four I think. I asked the man to save the old parts. If the case came to court I could back up what I say. And I don't get paid by anybody whatsoever, I hire one hundred and twenty men, I don't have to.

Mr. W. M. Jurgens, testifies that he was in the automobile repair business and inspector for insurance companies, and has been so engaged in the repair business for twenty years and nine years inspector for insurance companies. He further testifies that he examined the automobile of plaintiff in this case; this was about one month subsequent to the fire and without extending the witness's testimony more than is absolutely necessary, for a decision in this case, he says:

Q. You found no evidence of fire, you say. What was the nature of the damage to the parts which you saw?

A. When I went to the car to examine it, I found all the parts thoroughly cleaned, the mechanic was overhauling the car and I began to examine the hose and wire connections, which is the first thing which show evidence of a flame, and that seemed to be in first class condition, outside of wear and tear. And he also mentioned to me about cylinders being scorched.

In other parts of this witness's testimony he states that the damage occurring to the automobile was not caused by fire but was caused by lack of lubrication and he goes on to give his reasons for this answer to this particular question.

On cross examination, being asked the nature of his business, he answered: "My business is inspector of insurance

examination—it is automobile repair business and inspector for the insurance companies;"and further on cross examination witness testifies "I investigate losses in this manner. I make estimates on all damages, such as collisions, fires, property damage, and if the assured can agree to my figures, the insurance company directs the delivery of work to my shop.

In answer to the question: You did find them scorched? A. Cylinders all scorched and bearings all damaged, but not by fire.

Q. And your conclusion is it was not by fire? A. No my conclusion but my experience in this business.

An examination of this record proves that there was a fire, witnessed by Mrs. Hochstein and Warren Lockett; immediate notice of the fire was given to the defendant company, and about a month after the fire, having received the notice in question, defendant company sent their representative to examine the automobile in question. These witnesses for defendant have testified not from their knowledge of what occurred the date of the fire, but from their experience with losses and repairs or other work to be done by the insurance company, and whilst affirmative evidence was only contradicted by theories, which whilst displaying a great deal of knowledge and skill, (to which the testimony of Mr. Pique an expert, is contradictory,and affirmative to the testimony given by the witnesses for plaintiff), yet does not disprove to my mind ; the fact that the fire occurred on the day stated and under the circumstances sworn to by the two witnesses for plaintiff in this case.

I cannot under any circumstances, in a case of this character, accept expert testimony, no matter how intelligent these experts may be, as against the testimony of witnesses to facts, at the time of the occurrence. Particularly is this the case when the experts or other witnesses of the defendant company had not examined, for a month or more after the fire, the automobile in question.

The plaintiff has filed an answer to the appeal

claiming damages allowed by Act 168 of 1908, same being fixed by the statute as against fire insurance companies, which do not pay their losses on a policy of insurance, and he has prayed for twelve per cent damages together with the sum of One Hundred Dollars as attorney's fees.

I am not disposed to grant the damages prayed for under the law cited, and I refer to the opinion of the Supreme Court of this State, found in the 143 La. Ann. at page 621, Whiteside et al vs. Lafayette Fire Insurance Co., wherein quoting the statute the Court goes on to say:

"We find nothing in the statute to justify our limiting the imposition of the penalties to cases where insurance companies willfully refuse to pay what they owe. We doubt that the Legislature believed that insurance companies ever willfully or arbitrarily refuse to pay their losses; and we are quite sure the statute was not intended to fix a price or penalty that an insurance company should pay for the privilege of withholding money due to an assured until the end of an indefensible law suit.

The plaintiffs have prayed, in answer to the appeal, for damages for a frivolous appeal; but the ability and industry with which the appeal has been presented and prosecuted convince us that the learned counsel for the appellant were very much in earnest, and that the appeal was not taken merely to delay payment of the judgment."

And so say I in the present case.

For the reasons assigned, I respectfully dissent from the majority opinion in this case.